Our next case for argument today is 24-1147, DirectPacket Research v. Polycom. Mr. Ross, please proceed. Good morning, Your Honor. Good morning, panel. Mr. Ross, for the appellant, DirectPacket Research, which is also the owner of the 588 patent, which is the patent that issued here today. As the court knows, the district court held below that the 588 patent was not patent eligible because it is directed to, quote, the abstract idea of language translation. The district court reached that wrong conclusion because it misapplied this court's teachings under ATLAS. In approaching the directed-to inquiry at Step 1 of ATLAS, this court has repeatedly said, you've got to ask, quote, what does the patent assert is the focus of the claim to advance over the prior art? And if the answer to that question, why is it in the realm of computer technology as it does here, then this court suggests that you really have to ask another question, which is whether the advance is so specifically described as not to merely claim a functional result. And so let me start with the first question, which is what is the focus of the 588 patent? And I think that's crystal clear. It says so in the face of the patent, that this is about solving the interoperability problem that exists in video conferencing. It says that right at the bottom of the first column, column 1, lines 54 to 61. So isn't that just a way of saying the patent relates to translation, putting a data stream in one protocol into a different protocol? Why is that an advance? So because this does not involve data translation, data conversion, whatever terminology you want to use. This involves the incompatibility, involves the communication protocols. Communication protocols are machine-directed commands, sometimes called signaling commands, signaling protocols. They have nothing to do with language. They have nothing to do with data conversion. It's simply a very detailed instruction to a device to perform a function. That's all it is. The patent's clear in its face on that. That is wholly different from any sort of human language translation. In particular, Your Honor, in this patent, we don't teach any sort of one-for-one conversion, or to use the language you use in the court, use one-for-one translation. We interpose a new, simpler, more efficient intermediate protocol. So let's stop there. Because you say that in the briefing a lot, that it's a new, simpler protocol. The claims don't require a simpler protocol, correct? There's nothing in the claim that requires the protocol to be simpler. That is one embodiment. You're correct. However, a person of skill in the art would look at the step in Claim 1, where it says converting said first protocol, which is a signaling protocol, into an intermediate protocol. And then, as this Court said in Tex-Ex, you don't stop at the language of the patent. You look at how that language is informed by the specifications. That's critical to 101. You go back into the specifications, and 101 says that this intermediate protocol will be a simpler, more efficient protocol. Well, the patent actually says, doesn't it, that you're going to go through and do a line-by-line conversion. And that line-by-line conversion is essentially wrapping the data in the previous protocol with a wrapper for the new protocol. Correct, for the intermediate protocol. But, Your Honor, if you look at column – And just before we leave that point, just one thing I want to make clear is the patent talks about the conversion being more efficient because you're using messages from either protocol. But it never talks about the transmitting the data as being more efficient. So, Your Honor, if I may first finish up the first inquiry, which is you look at column 3 at lines 44, 45, 46. It says the translation into the interim or intermediate communication protocol simplifies the protocol signals into their common elements. So the mere act of transforming them into their common elements affects the simplification. This is easy. Simplification for translation. Simplification, it doesn't say for translation. However, a person of skill in the art would understand that this is a multimedia communication over the Internet and that time is critical. This is a real-time transmission. But do you agree that Claim 1 does not require real-time exchange of multimedia communication? No. I believe it does require that. And I would say that a person of skill in the art would say that it requires – Where is that – what language in the claim itself puts that requirement forth? Because it sounds like that's what you're arguing for. But can you point me to a claim language that you think – Sure. The usage in the preamble of a multimedia data stream would be understood as, by a person of skill in the art, Your Honor, it's column 7, line 26, a method for multimedia communication. A person of skill in the art would understand that that requires real-time. Also, in art – You didn't have the district court do any claim construction to get that construction that you're proposing. No, there's no claim construction required. Paragraph 15 of our complaint, which must be accepted as true on a motion for 12C, states that it has to be conducted in real-time. So that's a factual issue that cannot be disputed against us. But it – Well, wait a second. Hold on. Can we also take the temperature down a little bit? I feel like we're – Oh, I'm sorry, Your Honor. We were enthusiastically discussing it. Okay. I'm enthusiastic, too. Okay. I mean, I love this kind of communication technology, and so I love it when a court actually – I'm like, well, what's the engage in a meaningful way? We like to engage meaningfully. I think I can speak for all of us on the panel in that regard. But what I was getting back to is I think that you did not specifically give a claim construction that has that preamble as being interpreted as requiring real-time exchange of information. Well, I hear what you're saying, Your Honor, and our position is plain and ordinary meaning, as interpreted by persons of skill in the art. This Court itself in the DDR case, which we cited, Judge Tanable, says that one of the characteristics of transmission over the Internet is the instantaneous transportation, and that that makes it different from the real world, which is absolutely true. But in the patent, we say that at column 1, lines 28 to 30, column 5, lines 18 to 24, the complaint, paragraphs 15 to 16. These all have to be accepted. In the TxSEC case, this Court says, how do we decide 101? We look at the language of the patent as a whole, all of the elements, as informed by the specification. No, we don't look at the language of the patent as a whole. We look at the language of the claim as a whole. Correct, Your Honor. Language of the claim as a whole. You're pointing us to all the specification language, and you would like us, I feel like you're asking us, to read a lot of limitations into the claim. Where in the claim are these limitations grounded in the language of the claim? Yes, Your Honor. So in claim 1, it says converting said first protocol into an intermediate protocol. We then look at how converting is used in the specifications, and in every place where it is used, it describes comprised, an intermediate protocol comprised of the common functionalities or elements of the two non-interoptible. And that's at column 2, lines 10 through 15. But stop. The word converting has a broad meaning. Are you saying that the patentee acted as his own lexicographer to say you can only convert in a particular way in this patent? And if so, where is the clear and unmistakable definitional language? Not examples in the spec, because the word converting, you chose to claim broadly. You may give examples in the spec which are much narrower. If you want me to read the word converting as being way narrower than its broad meaning, you have to show me where the patentee made clear that it was given that narrow meaning in the spec. So our argument would be the person of ordinary skill in the art would understand the plain ordinary meaning of converting by looking at the specifications. And that informs what that word converting means. And I don't know if that makes us our own lexicographer or not. If Your Honor is suggesting that that makes... Where is the language in the spec that you think defines the word converting in this way that draws in these other limitations? Yes, Your Honor. It would be column 2, lines 10 through 15. Again, at column 3, lines 33 to 30. So 10 through 15 says the intermediate protocol may be created to reflect the commonalities between the various communication protocols that are expected within the system. The multimedia data stream in this communication, in this intermediate protocol is then transmitted. So I don't understand. What about that is it you're going to say informs my understanding of what the word converting first protocol into an intermediate protocol means? Well, it would also be column 3, lines 33 through 37. Well, you can't say also if you haven't shown me anything about column 2. Also would imply here's some meat and here's also some potatoes, right? Like, also implies there's something else, but you haven't shown me anything about column 2 that adds definitionally to the converted... There's nothing I can add other than the words there, so we should move to column 3 at lines 33 to 37. Where it says that the text-based protocol and converts it line by line into an interim protocol that comprises the common functions and elements of the different protocols. I don't think that could be any more clear, Your Honor. You don't think what could be any more clear? So this is a description... Of how the conversion process works. No, this is a description of what's shown in figure 1A, correct? A detailed description of the invention. And so what about this language do you think is imported into the claim? Well, it describes how it's converted. It's converted in a line by line into an interim protocol that comprises the common functions and elements of the different protocols. And you think that the broad claim that says converting a first protocol into an intermediate protocol now requires line by line conversion? I think that's one embodiment as suggested by the previous citation. Right, one embodiment, but that's not what the claim covers. The claim covers way more than that. It could cover lots of other kinds of embodiments too, right? Well, if Your Honor is suggesting that it's going to focus on converting and saying that that's what this patent is directed to, then under step 2 we would look, as you described in your Berkheimer decision, we'd look at the dependent claims. None of these are mine. None of them are Judge Chen's. These are decisions on behalf of the court. On behalf of the court, we'd look at dependent claims 6, 16, and 23, all of which describe specifically in the claims those terms. And I think those are inventive concepts here that add on to the patent. Since you took us to the dependent claims, I thought you had an argument potentially about being concerned about just focused on claim 1. But to be clear, you never separately argued in terms of why it would pass the 101 filter, so to speak, for the dependent claims versus just the independent claims, right? No, we did. The dependent claims would only be used in step 2, so you look at the step 2 argument in both the briefs below and the brief here. Berkheimer just lays this out very nicely. In Berkheimer, they found that step 1 was directed to an abstract idea, so you shift to step 2 to look for some added inventive concept, and it found it there. Here, that added inventive concept, if you disagree with my interpretation of converting... Can you point us to a site in the record where you argue before the district court separately on the dependent claims versus the independent claims? Yes, Your Honor. The appendix, page 00802. We argued, and I'm quoting here, simplifying the protocol signals contained in the multimedia data stream into their common elements was a key innovation in the 588 patent. The court actually, and we point it at a separate place to appendix 123, the court actually ruled against us on that, and therefore it's present before this court. I'm having a little trouble tracking that argument. Yes, so I made it to 00802, and I was trying to see where there were separate arguments on dependent claims versus independent claims. Can you show me something on 802 that shows me that? Because I'm not seeing it just on the face. If I may just have a moment, Your Honor. Earlier in the brief, we referenced the dependent claims because the court had argued that, or Polycom had argued, that claim one was representative for all purposes. And we said, so that's not actually true. We dispute that, and we pointed out a number of dependent claims, including 2 through 12 and others that are listed there. And then during the argument section of when we shifted to the step 2 argument, we said, amongst arguing amongst other dependent claims, we argued that here you simplify the protocol signals into their common elements, which is essentially what the dependent claims 16 and 23 said expressly on their face. Okay, well, we've used all your time and your rebuttal time. I'll restore some rebuttal time, but let's hear from opposing counsel. Thank you, Your Honor. Counsel, how do I say your name? Rays Plessis, Your Honor. Mr. Rays Plessis. Good morning, Your Honors. May it please the court, I want to start with the two points that counsel raised during his argument. First, this notion that the intermediate protocol is some type of simpler or more efficient or intermediate protocol that has common elements between the first and second protocols of the claims. Two points in response to that. That is not required by any of the claims in this case, and it's not an improvement regardless. So with respect to claim scope, none of the claims require the intermediate protocol to have commonalities between the first and second protocols. In other words, the protocols of the transmitting and receiving communication devices. At most, claims 6 and 16, which Direct Packet never mentioned anywhere in their opposition to the Rule 12c motion, recite that the intermediate protocol must have common messages between a text-based and a binary protocol. However, none of the claims in the patent, including the claims from which 6 and 16 depend, so 1 and 11, require the use of both a text-based and a binary protocol. But doesn't defendant claim 6, defendant on claim 1, claim 1 says either of them could be text-based or binary. Correct. So claim 6 says use common elements of a text-based and a binary. So doesn't claim 6 contemplate an embodiment of the invention where you've got two different protocols, one text-based and one binary, and you're using common elements of both? I don't think so, Your Honor, for a couple of reasons. First of all, claim 1 and 11 simply presuppose the existence of a text-based and a binary protocol. So they don't require the selection of both of those protocols. So you can have an embodiment in claims 6 and 16 where the intermediate protocol has common elements between a text-based and a binary protocol, which the independent claims presuppose exist, without requiring the selection of those particular protocols for the first and second protocols, respectively. And Direct Packet itself made this argument to the district court. That's at Appendix 382, third line from bottom, Direct Packet said the first and second protocols can each comprise a text-based protocol. And in addition, the patent makes clear there are multiple text-based or binary protocols. That's at column 3, lines 25 through 29. So you could have a situation where the first and second protocols are both text-based and they're just different text-based protocols. But wouldn't claim 6 imply then that you have to use common elements of each protocol, even if they're both text-based or even if they're both binary? No, Your Honor, because that's not what claims 6 and 16 say. They simply say that the intermediate protocol comprises common elements between said text-based protocol and said binary protocol, which again are presupposed to exist in the independent claims. No selection of those particular types of protocols is required for the first and second protocols of the devices. But I think in any event, even if this were required by the claims, and even if it weren't waived, it's still not an improvement because there's nothing in the specification that connects these common elements to any type of improved method of conversion or transmission. In fact, the only method of converting from one protocol to another that's described in the entire patent is to look up each protocol message, one by one in a table, to find the corresponding message in a different protocol. It never says there's some kind of efficiency or that you can skip that step if there's a common element. So the patent never connects these commonalities or simplifications to any improved transmission or conversion process. But the specification at column 2, lines 23, by providing the interim or intermediate protocol, translation or conversion between different protocols is quick and efficient. Isn't that the gist of what the patent is trying to claim, that using this intermediate protocol is going to make translation more efficient? So the patent does use those words, quick and efficient, Your Honor, but it's simply stated as a completely conclusory result. The specification doesn't explain how that desired result of quickness and efficiency is obtained. Well, one way, it provides an example of a lookup table, right? Having two lookup tables and an intermediate protocol that keys you into that lookup table, the patent says would make translation quick and efficient. And if you're interpreting between two different multimedia platforms, Zoom and Skype, you need to have the translation quick and efficient in order to enable real-time communication. Isn't that the gist of the patent? I don't think so, Your Honor, for a couple of reasons. One, it never actually says that it is quicker or more efficient to use an intermediate protocol than it would be to translate directly between the protocols, which DirectPak admits would be a conventional solution. And also, there isn't an intermediate protocol that keys in a single table here that allows for quick and efficient transmission between incompatible protocols. The way it's actually described is there are two tables. There is one table where there are first protocol messages and they correspond to intermediate protocol messages, and then a second table where the intermediate protocol messages correspond to second protocol messages. So regardless of whether you have an intermediate protocol or not, you are still going through the rote process of looking up each message in a table exactly how translation has always been done. It's no different than looking up words in a dictionary, as the district court observed at Appendix 9, and I don't think that's been directly challenged by DirectPak. Let me ask you a question about that because that brings up an interesting point. The district court came up with several articles and additional information to base its decision that this was not a patentable subject matter. It didn't seem to allow the parties an opportunity to respond to what was said in those articles. Isn't that error? I don't think it's an error, Your Honor, for a couple of reasons, and perhaps the simplest reason is just that patent eligibility is reviewed de novo. It's true we didn't cite those articles, and we're also not relying on those articles on appeal. But in the 12C context, are you really arguing just that it's harmless error? Because it's hard put to not say that when you're looking at it in the 12C context, it sounds like the district court went outside that normal universe you would examine. Well, I think to the extent this court were to find that it were error, yes, it would be harmless error. However, we don't think it's error either. I think courts have discretion to take notice of longstanding practices at Alice Step 1, and in fact a very similar argument was rejected in Affinity Labs versus Amazon, which was the same posture on a Rule 12C motion, and the patentee there also argued that the district court had improperly made fact findings at Alice Step 1. So are you fundamentally arguing first that the district court could have taken judicial notice of these articles? That's your argument against error at all. And then what's your argument with respect to harmless error? Sure. So the first point, Your Honor, I think what the district court here did was take judicial notice of the undisputed fact that humans can translate between two languages via an intermediate language or bridge language. It's an example that we repeatedly made in the motion papers. We referred to the intermediate language as analogous to a lingua franca. So the problem I have with that is the district court didn't rely on these to take notice of the fact that they could do this. The district court's express statement is that it is commonplace human communication practice relay translation, which is precisely the translation of information through an intermediate language, and then cited a couple of articles, commonplace, that this is common. Relay translation is common in polyglot communities for use in circumstances ranging from refugee and asylum centers to court proceedings and sign language communication. I think it would be different to take judicial notice of the fact of an article and to take judicial notice that something is commonplace, especially in particular forums, with reference to a small, discrete number of articles, which the other side was not given an opportunity to address. Maybe they got 20 articles that say this is not at all commonplace. I don't know. How would I know? Well, I think if they did have those articles, Your Honor, they did have the opportunity to amend their complaint. The district court did give them leave to amend, and then they could have alleged any facts they wanted to the extent they believed they were material to the patent eligibility inquiry, and they did not do so. The district court gave them a chance to amend after this? Yes, Your Honor. At the end of the district court's opinion, the district court granted leave to amend the complaint, and Direct Packet, instead of taking that leave and amending the complaint, chose they filed a notice of intent not to amend, and that's which is at Appendix 836, and then the court entered judgment. So they did have the opportunity to amend their complaint. Are you familiar, or could you point me to? So first off, do courts take judicial notice without saying, hey, I'm taking judicial notice? I mean, do they do that? Like, is this a judicial notice case in your experience? Or are you saying this is not harmless error because it's akin to judicial notice? I think it's akin to judicial notice in the sense that the only fact that is material, potentially, to the eligibility inquiry is that humans can and do, at least sometimes, translate languages via an intermediate language like a bridge language. We don't rely on the examples that the district court cited to. For example, it doesn't matter whether relay translation was used in certain polyglot communities or with Malaysian court interpreters or with deaf interpreters. All those examples that the district court listed, we're not relying on those, and I don't think they make a difference. Did he rely on these articles in the context of the Step 1 analysis in deciding whether it was abstract or in the Step 2 analysis of deciding inventiveness? Solely in the Step 1 analysis, Your Honor. In analogizing the functional result of conversion or translation that is recited in the claims to a longstanding practice or human activity, which is only really one basis for finding these claims to be directed to an abstract idea. Because on the one hand, we do argue and we believe that simply interposing an intermediate protocol or language is indeed analogous to what humans have long done. Not necessarily with those examples that the district court cited, but with the everyday common practice of having... So this is your harmless error argument, then. This is where you've pivoted away from defending what his choice to bring in these articles, and you're now explaining to me why they don't matter as harmless error. Correct, Your Honor, which I think was part of Judge Cunningham's question. So I think it is also harmless error for two reasons. One, there is no serious dispute that humans can, and at least sometimes do, translate via an intermediate language. In fact, I think that is implicit in Direct Packet's opposition argument, which was at Appendix 800, that humans don't normally translate between two languages via a third language. But in any event, the analogy to human intermediate language translation isn't necessary to uphold this judgment at all. Because an independent problem with these claims, which we briefed, both below and in the red brief, and which the district court recognized, is that the conversion here is merely functionally claimed. And there's no real dispute that under this court's case law, merely reciting the function of converting from one protocol to another is an abstract idea. And the claims here just recite that function twice, both to and from an intermediate protocol. They call it... Let me make sure that I understand the underlying factual record properly. My understanding is that Direct Packet's counsel at one point, at least before the magistrate, brought up this analogy to sort of this language translation. Is that accurate? That is correct, Your Honor. So first of all, the patent itself refers to languages. It makes an analogy to language when it talks about incompatible protocols. There was also a hearing before the magistrate judge where Direct Packet's counsel made the analogy of these incompatible protocols being, well, you could have one system that speaks English, one system that speaks Spanish, and they would be able to talk to each other because of this translation. So that analogy was made in the first instance by Direct Packet itself, both in the patent and before the district court. Then in the briefing, we also analogized the intermediate protocol to a lingua franca, like English or like French in the Enlightenment or Latin in the Roman era. And Direct Packet responded by saying, well, you don't usually translate between two languages via an intermediate language. And in reply, we pointed to an example, we actually cited a case, noting that relay translation is, in fact, a recognized interpretation mode. Now, it's true, we did not cite any of those articles. Those are not part of the record, and we don't rely on them in our motion, and we didn't rely on them in the red brief. We believe the district court has discretion to cite extrinsic evidence when it would like to at Alice Step 1, which is a legal question, just in determining whether something is directed to an abstract idea. But we don't believe this court needs to rely on those materials, and we are not relying on those materials on appeal to sustain the judgment. I do want to briefly address the real-time conversion issue that counsel also mentioned. There is no claim construction that requires real-time conversion here. Counsel pointed to the complaint at paragraph 15, which is at A204. The complaint merely says that multimedia communication sessions typically involve real-time communication. And so it certainly doesn't require that. Direct Packet had the opportunity to raise claim construction in response to our motion. In fact, at Appendix 776, we argued that claim construction was not material. Direct Packet did not respond to that. So we would submit that all of these claim construction issues are waived. And so unless there are any further questions from the panel, we would ask the court to affirm the judgment. Okay, thank you, counsel. Thank you, notice. So as you heard, this is not a – Give us two minutes. May it please the Court, ma'am. As you just heard, this is not about judicial notice. Violating Rule 201, as Your Honor knows, requires you tell them and you give them a chance to rebut. So they say it's akin to that. There's no such thing as akin to that. You can take notice of technical dictionaries. The court does that all the time. That's not what happened here. Well, why didn't you amend? Because you were given the opportunity to amend. Absolutely. There was no need to amend. The complaint reads perfectly well if you look at paragraphs 15 through 23 of the complaint, which must be accepted as true. We describe how this practice was conducted before this invention and why this is an inventive concept. Those must be accepted as true. Did you ever directly raise to the district court a concern with it putting these articles in its order? No, because there was no hearing, Your Honor. But did you ever ask the district court for a hearing post the issuance of this order to raise the concern with respect to the articles? No, we did not, Your Honor, because it's not even identified as judicial notice. And we thought that would be a vain act. It was clear that the court had made up its mind and wanted to move forward. Now, let me address relay translation. That's not what's happening in this patent. Relay translation does not involve creating a brand-new language on the spot, which is what happens here with the intermediate protocol. And let me also address the question, Judge Scarsley, that you had started to get at with respect to 616 and 23. As Your Honor probably knows, there are only two types of communication protocols, two families, binary and text-based. So the argument that's made about Claim 6 is simply wrong because it miscontemplates that there are only two families of this. It has to be in those families. Just to close out on my line of questioning, you never moved for reconsideration of the order on the 101 issue? No, Your Honor. The advice we got from local counsel that that would not work. This is a court that would not give us more than 15 pages for a 101 argument in a very highly technical environment, would not hold a hearing on that. Best practice, as district courts know, is to always on a 101, hold some sort of technological hearing to try to understand it. And so it would have been a vain act, a waste of time, and a waste of the client's money, quite frankly, to have done that. Why do you think it's not harmless error for the court to have relied on these arguments? Well, it's harmful error because this is exactly the reason the court found the patent to be patent ineligible. And the usage of them was not limited to Step 1. It was used at Step 2 to show nonconventionality, a fact-finding that the court was not allowed to make at a Rule 12c hearing. As Your Honor correctly defined, it's questioning of happily. The nonconventionality element is... Okay, I think we're good. I thank counsel. This case is taken under submission.